Opinion delivered April 22, 1886.

---

[No. 3749.]

## A. S. Humbard v. The State.

1. SLANDER—INDICTMENT for slander by imputing a want of chastity to a female, setting forth the words constituting the alleged imputation, and otherwise conforming to No. 403 of Willson's Criminal Forms, is sufficient to charge the offense of oral slander of a female as that offense is defined in Article 645 of the Penal Code of Texas.

2. SAME—EVIDENCE.—From the rule which requires that the slanderous words shall be substantially alleged, it follows that they must be substantially proved. This rule does not require that all of the *words* shall be proved, but that the essential, important, material portion of the slander must be proved as laid. Proof of one imputation will not support the allegation of another.

3. SAME—VARIANCE.—The name of the alleged injured party as it is designated in the indictment must be sufficiently proved to identify the party, and unless this is done the proof will not only be held insufficient, but the variance between the proof and the allegata will be held fatal. See this case in illustration.

APPEAL from the County Court of Dallas. Tried below before the Hon. E. G. Bower, County Judge.

The conviction in this case was for the slander of R. J. Huckaby, an unmarried female, by imputing to her a want of chast-

ity, the slander consisting of the imputation that the said R. J. Huckaby was unchaste; that Ras Huffman was screwing her; that the said Ras Huffman had been seen in bed with her; that he had been seen on top of her in bed, and that he had been seen getting off of her. The penalty assessed against the appellant was a fine of one hundred dollars.

W. W. Aulick was the first witness for the State. He testified that he knew both Ras Huffman and Miss Rebecca J. Huckaby. He also knew the defendant. Miss Huckaby was the half sister of the said Ras Huffman. Witness went to church on Sunday, February 8, 1885. En route he met the defendant, who was then traveling from towards White Rock. After a few minutes of general conversation, defendant remarked: "That is a terrible report about Huffman," or "Huffman has got into a terrible fix." Witness asked: "What's that? What Huffman?" Defendant said: "Ras Huffman." Witness then asked: "What is it?" Defendant replied: "Ras has been screwing his sister." Witness asked: "Who? Becky Jane?" Defendant replied: "Yes, Becky Jane." Witness expressed a doubt of the truth of the report, and defendant replied that he "guessed it could be substantiated," and proceeded to give the names of several persons by whom the report could be substantiated. He said further that the report was in the mouths of all the youngsters. He said that he had discussed the matter with one John Daniels, and that one Kennan, while passing Huffman's house, looked in at a window and saw Ras Huffman getting off of Becky Jane; that one John Barber, on another occasion, saw her holding her clothes up to her waist while the said Ras tickled her thighs, or "chigered" her. Witness understood the defendant to state, as a matter of fact, that "Ras Huffman was screwing his sister." He did not, as the witness understood him, speak of it as a matter of rumor.

Cross-examined, the witness testified that he had stated his conversation with defendant as nearly *verbatim* as he could. Witness, defendant, Huffman, and Miss Huckaby were members of the same church. Witness told the defendant that Huffman ought to be made aware of the nature of the reports in circulation about him and his sister, and that he, witness, intended to tell him. Defendant expressed himself as concurring with the witness's opinion, and said that it would be no more than right to tell Huffman.

J. A. Williamson testified, for the State, that he knew the de-

fendant, Ras Huffman, and the latter's half sister, Miss Rebecca J. Huckaby. In the fall of 1883, witness had a conversation with defendant about Ras Huffman and Miss Huckaby. A Doctor King was boarding with defendant at that time. Miss Huckaby was then living with Ras Huffman. One night Doctor King was called to see Miss Huckaby professionally. In a conversation between witness and defendant on the next morning, defendant said that, on Doctor King's return on the night before, he asked Doctor King if Miss Huckaby was much sick; that Doctor King replied: "No, she only had a little nightmare, and will soon be all right;" that he, defendant, replied: "Grown people don't have nightmare. I guess she is breeding." In another conversation, defendant told witness that Sister McReynolds, the mother-in-law of Ras Huffman, told his, defendant's, wife, that something was wrong at Ras Huffman's, and that time would tell. Miss Huckaby was an unmarried female, about twenty-three or twenty-four years old.

Cross-examined, the witness testified that Ras Huffman was a widower, with three children. Witness had lived within a quarter of a mile of Ras Huffman for the past twelve years, and had never heard rumors involving Miss Huckaby's chastity until they were detailed to him by the defendant. Mrs. McReynolds lived with Huffman and his children until Miss Huckaby came to Huffman's house to live. Two or three months after Miss Huckaby took up her abode with Huffman, Mrs. McReynolds left, and has since died.

Cord Rupard testified, for the State, that on or about February 6, 1885, defendant asked him: "Isn't that awful talk on Huffman?" Witness asked: "What talk? I have heard no talk." Defendant replied: "About Ras and his sister screwing." He said that Henry Smith told him that Ras was screwing her, and that he could prove it; that one Kendall(?) caught Ras and Miss Huckaby in *flagrante delicto*, and that Henry Smith defied the world to successfully contradict the fact, and had said that he, Smith, could prove it in two hours. Defendant remarked: "If I was Ras I would do something with it, or I would leave the country."

Cross-examined, the witness testified that the defendant, in the conversation detailed, remarked that Huffman ought to be apprised of the reports current about him and his sister. Defendant said that Henry Smith told him about the reports. Miss Huckaby had lived at Huffman's house about four years, and

was the only female living on the place since Mrs. McReynolds left. Mrs. McReynolds left Huffman's house soon after Miss Huckaby moved into it. Witness had heard similar reports before this conversation with the defendant. He heard them from John Carroll.

Buck Burgess testified, for the State, that he met the defendant on or about February 10, 1885, on which occasion defendant asked him if he heard the reports on Ras and Becky. Witness replied that he had not, and asked what they were. Defendant replied that, according to reports, Ras and Becky were too thick; that she had been seen on Ras's lap, with her clothes up to her waist, looking for chiggers. He said that old lady McReynolds told his wife that she saw things she did not like before she left Huffman's house. Witness asked defendant if he was not afraid to repeat such rumors. He replied that he was not; that Henry Smith was telling it around, and claiming to be able to verify his statements by competent and overwhelming testimony.

W. F. Williamson testified, for the State, that defendant, on the eighth day of February, 1885, told him that Henry Smith said that Mrs. McReynolds caught defendant sitting on Miss Huckaby's lap, and that Miss Huckaby's clothes were drawn up. Defendant told witness, in the same conversation, that one morning after Doctor King got back from a professional visit to Miss Huckaby, he asked him, Doctor King, how Miss Huckaby was; that the doctor laughed and replied that she had nothing but a little nightmare; and, that he replied to the doctor that grown people did not have nightmare, and that Miss Huckaby's projected trip to Missouri was to give birth to a young one. Witness did not tell defendant that he had heard such rumors before. He never told defendant and Gus Deford that such rumors had been told him by Henry Smith.

Levi Martin testified, for the State, that, on or about February 8, 1885, defendant told him that reports were current that Ras Huffman and his sister, Miss Huckaby, were too thick, and had been for four years. Witness, defendant, Huffman, and Miss Huckaby were members of the same church, and the statement of defendant was made during the discussion of church matters.

Rev. J. F. Pinson testified, for the State, that he had been in the Baptist ministry for fifty years. Defendant dined with witness after church services on the first day of February, 1885. The church troubles coming under discussion, the defendant remarked that the pending troubles were as nothing compared to

the cyclone that was going to burst over it in a short time. Witness, and his wife, asked him what new troubles were brewing. He replied that it was too bad to repeat, and witness and his wife joined in saying that they did not want to hear it. Witness walked to the horse lot with defendant after dinner, when defendant told him the cyclone he referred to was the impending exposure of an illicit intimacy which existed between Miss Huckaby and her half brother, Ras Huffman. He then related the episode in which Doctor King figured, substantially as it was stated by previous witnesses. Defendant told witness that a man whose name witness could not recall, but who lived on Huffman's place, in passing Huffman's house on one occasion, looked through the window and discovered Ras and Miss Huckaby in the very act of sexual intercourse; that that man, a few days later, told Huffman that he thought he, the man, had better leave the place, as he did not think Miss Huckaby wanted him about, and that Huffman replied that he was glad he, the man, was going; that that man told John Williamson all about his discovery, that he was going to leave, and that he left his post office address with Williamson, and told Williamson that if he was needed to testify to the fact at any time, he would be forthcoming. Defendant said that John Williamson spoke to him more than a year before this conversation about Miss Huckaby's condition which was, in many respects, similar to a woman in a state of pregnancy. He said, further, that old Mrs. McReynolds, now dead, had seen reprehensible conduct on the part of Huffman and Miss Huckaby.

William Scott testified, for the State, in substance, that in February, 1885, defendant told him that it was currently rumored that Huffman and his half sister, Miss Huckaby, were sleeping together; that one Barber saw Miss Huckaby sitting in front of Huffman on one occasion, with her dress up around her waist, catching chiggers, and that it was generally believed that Miss Huckaby had gone to Missouri to be confined. He said that it was wrong for Huffman to bring Miss Huckaby back, and that if he, Huffman, was ignorant of the reports, some friend ought to tell him. He, defendant, said that some of his information was derived from Henry Smith. The State closed.

A. B. Kirk, the first witness for the defense, testified that he was, by profession, a Sunday school missionary and a school teacher, and that he had no permanent place of abode. Witness lived at Ras Huffman's house from April 14, 1885, until August

10, of the same year. Huffman's house contained four rooms, of which, so far as the witness knew, but two were sleeping rooms. Witness and one Black occupied one of the sleeping rooms. Witness was never in the other sleeping room while the bed was occupied. There was no bed in the kitchen. Witness could not state upon oath where Huffman slept. There was an upper story to the house. Huffman had two daughters, one about eleven and the other about seven years old. The witness never conveyed a message between defendant and Huffman in regard to this prosecution, and was never asked to do so.

J. T. Mullinas testified, for the defense, in substance, that one Williamson told him, in his shop in East Dallas, during the spring preceding this trial, that, had it not been for some trouble which grew out of a dispute about the location of a road, this prosecution would never have been instituted. Williamson was then drunk, and his tongue was quite "limber." Witness could not say that he did not know what he was talking about.

Gus Deford testified, for the defense, that he had a conversation with Frank Williamson about a certain conversation he, Williamson, claimed to have had with defendant, and one Scott, about Miss Huckaby's visit to Missouri. Frank Williamson told witness that the defendant did not use the word "baby" in that conversation.

Georgia Brown testified, for the defense, that she lived at Huffman's house during the year 1883. Huffman's house contained six rooms, three up and three down stairs. Huffman and Miss Huckaby slept in the same room, each having a daughter of Huffman as a bed fellow. Witness had never seen Huffman and Miss Huckaby lying together in the same bed. Witness had seen Miss Huckaby lying on a pallet, on the porch, with Huffman sitting by, jerking a paper out of her hand.

William Picket testified, for the defense, that, passing Huffman's house one day. at an unusual hour, witness saw Huffman hugging Miss Huckaby. His arms were about Miss Huckaby's shoulders. No one beside themselves were in the room. Huffman had not been absent from home. Miss Huckaby made no effort to get away from Huffman.

Mrs. A. W. Deford testified, for the defense, that, one morning in May, 1885, she went to the well at Huffman's house to get a bucket of water. As she approached the house she saw Miss Huckaby standing in the door with her arms around Huffman's neck. As soon as Miss Huckaby saw witness, she fled in the

house. During the preceding month (February, 1885) Miss Huckaby, at the well, told witness that she had learned from her aunt, Mrs. Fisher, that Mrs. Kendall accused her (Miss Huckaby) and Ras Huffman of being too thick, and of living together as man and wife. In the same connection, she called Mr. Kendall a d—d son-of-a-b—h, and said that, had she been informed of Mrs. Kendall's charge before Mrs. Kendall left, she would have killed her. She had frequently told witness that she heard that Georgia Brown reported that she and her brother were too intimate, and that she told Georgia she would kill her if she repeated the statement. Defendant was an uncle of the witness by marriage. Witness's husband and Ras Huffman once fell out about some cotton. Their disagreement resulted in a law suit.

J. L. Barber testified, for the defense, that, in 1883, he lived on Ras Huffman's place, about two hundred and fifty yards from Huffman's house. On one occasion witness saw Ras Huffman and Miss Huckaby lying together on a pallet. This was on the porch, and in the day time. When she saw witness Miss Huckaby fled into the house. Huffman, perfectly composed and unconfused, remarked: "You caught sis on the pallet with me, and she got scared and run." On another occasion, on the back porch, and in the day time, witness saw Miss Huckaby sitting in defendant's lap, toying with his whiskers. She got up on seeing the witness. On another occasion witness saw Miss Huckaby, with her clothes drawn up above her knees, picking chiggers off of her legs. Huffman, at that time, sat directly in front of her. The children were then playing at a point to their right. Miss Huckaby dropped her dress, to cover her legs, when she saw witness. Witness had seen Huffman and Miss Huckaby as often as three, four, or five times, go into the house loft together, unaccompanied by any other person. Witness could not say what they went into the loft for, unless to hunt eggs.

Mrs. J. L. Barber testified, for the defense, that, on one occasion, in the day time, she saw Miss Huckaby sitting on Huffman's lap, with her arms around his neck. This was on the back porch. Neither of the affectionate couple discovered witness. Witness and her husband went to Huffman's house one night to escape the possible effects of a storm, their house being shaky. Miss Huckaby was in bed, apparently asleep. Huffman was up and dressed. He accompanied witness and her husband, when they left, as far as the gallery. Witness, with her baby in her arms, got lost from her husband and stumbled over some rocks.

She looked back as she fell, and saw that Miss Huckaby, in her night dress, had come out on the gallery, and was squatting down by Mr. Huffman. Witness called to her husband, and Miss Huckaby fled back into the house. Miss Huckaby was dressed in a night suit of flannel, which consisted only of slips and waist. She wore no gown. She squatted close enough to Huffman to be touched by him. Witness could hear nothing said by either of them. They were between the witness and the light, and were about the length of the Dallas court room distant from the witness. At another time witness saw Miss Huckaby bathe herself. She was then sick. Huffman and witness were in the room. When the little girl came into the room, Miss Huckaby sent her out, but witness and Huffman remained. She had on, at the time, only the skirt of her dress, having removed her polonaise. She bathed her body and feet. Witness remarked to Miss Huckaby, at the time, that she, witness, had never bathed so near nude, in the presence even of her husband, and she thought that, even if Mr. Huffman did not care for her, Miss Huckaby, he ought to respect her, witness, too much to remain in the room at such a time.

Cross-examined, the witness testified that she had never harbored an unkind feeling towards Huffman or Miss Huckaby, and never knew it if they ever had ill feeling for her. Miss Huckaby had on no corset during the bathing process described. She bathed her neck and shoulders. The defense closed.

Ras Huffman testified, for the State, in rebuttal, that he understood the nature of this case. He denied vigorously that he had ever been guilty of an impure act with, thought of, or demonstration towards his half sister, Miss Rebecca J. Huckaby. There was not a shadow of truth in the imputations made by the defendant. Miss Huckaby never, in the spring of 1883, or at any other time, in a room at witness's house, or at any other place, bathed her person in the presence of the witness and Mrs. Barber. Barber and his wife always sought shelter in storms at witness's house, but Miss Huckaby never, en dishabille, on any occasion, at night, after the Barbers left witness's house, stooped down near witness on the gallery of his house. The witness always bought his sister's clothing, and had never bought her any flannel except on her departure for Missouri in the fall of 1885. Witness had no recollection of telling Buck Burgess that he would not take ten such farms as the one he then owned for what defendant had said. If he did say as much to Burgess, it

was because of the evidence he had collected against defendant. Witness's feelings towards defendant were very unkind, and he had employed counsel to prosecute this case.

Buck Burgess testified, for the defense, in rebuttal, that Ras Huffman told him in February, 1886, that he would not take ten such farms as he owned for what he heard on that morning. He said that his traducers had gone so far as to charge that Miss Huckaby had gone to Missouri to be delivered of a child.

The motion for new trial raised the question discussed in the opinion.

*Stemmons & Field* and *Crawford & Crawford,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

White, Presiding Judge. This is an appeal from a judgment of conviction for slander under Article 645 of the Penal Code, appellant having been charged with having, maliciously, falsely, and wantonly in the presence of one W. W. Aulick, imputed a want of chastity to one R. J. Huckaby, an unmarried female person.

The slanderous words constituting the alleged imputation are set forth in the indictment as is required in such cases should be done (Willson's Crim. Forms, No. 403, p. 180), and the indictment sufficiently charges the offense.

Another well established rule is, in such cases, that, "it being necessary that the slanderous words should be *substantially* alleged, it follows that they must be substantially proved. This means that the essential, important, material portion of the slander, as alleged, must be proved. All the words alleged need not be proved, but enough of them must be proved, as laid, to constitute the offense. It will not do to allege one imputation and prove another. Proof must correspond with allegations. This is an elementary rule governing in criminal, as well as in civil actions, and cannot with safety and justice be disregarded." (Conlee v. The State, 14 Texas Ct. App., 222.)

W. W. Aulick testified to the statements made by defendant to him. He testified that defendant had said to him: "Ras has been screwing his sister." Witness asked him: "Who? Becky Jane?" and defendant said: "Yes, Becky Jane." There is no proof in the record that "Becky Jane" is R. J. Huckaby; or,

that R. J. Huckaby is called "Becky Jane" Huckaby. It was essential that this proof should have been made. There is no allegation in the indictment that R. J. Huckaby is the sister of Ras Huffman, nor that R. J. Huckaby was ever known or called "Becky Jane." There should have been a proper averment and proof, or at least there should have been proof identifying the party as having or being known by both names. (Cassaday v. The State, 4 Texas Ct. App., 96.) "The name of the injured party as it is designated in the indictment must be proven sufficiently, so as to identify the party (Hardin v. The State, 26 Texas, 113; Perry v. The State, 4 Texas Ct. App., 566; Murphy v. The State, 6 Texas Ct. App., 554; Loving v. The State, 9 Texas Ct. App., 471; Weaver v. The State, 13 Texas Ct. App., 191), and unless this is done, the proof will not only be held insufficient, but the variance between the allegations and the proof will be held to be fatal."

As shown by bills of exceptions the defendant proposed to prove by a number of witnesses that for three years prior to the institution of this prosecution, the report was current in the neighborhood where the said witness and the parties involved in the slanderous imputation lived, that a criminal intimacy between the parties involved existed, and had existed for a long time anterior to the institution of this prosecution, and the evidence was held inadmissible by the court. This evidence was admissible upon the issue of the intent of the accused in uttering the alleged slander; that is, whether he did so maliciously, or wantonly, or having good reason to believe it to be true. (McMahon v. The State, 13 Texas Ct. App., 220; Duke v. The State, 19 Texas Ct. App., 14.)

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*